

Eileen W. Hollowell, Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

In re:                                  )    Chapter 11
                                        )
REID PARK PROPERTIES, LLC,              )    Case No. 4:11-bk-15267-EWH
                                        )
                                        )
           Debtor.                      )    **MEMORANDUM DECISION**
_____)

# I. <u>INTRODUCTION</u>

Reid Park Properties, LLC ("Debtor") seeks confirmation of its plan of reorganization, which provides for the infusion of new capital by a third party in return for a controlling equity interest in the resulting reorganized entity. The plan cannot be confirmed because it provides significantly more favorable treatment to the investor than to Debtor's creditors, thereby failing to satisfy the fair and equitable requirement for confirmation.

# II. <u>FACTUAL AND PROCEDURAL HISTORY</u>

## A. <u>Debtor's Chapter 11 Case</u>

On May 26, 2011 ("the Petition Date"), Debtor filed for Chapter 11 relief.[1] Debtor owns the Doubletree Hotel Tucson at Reid Park, Tucson, Arizona ("the Hotel"), which it

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

purchased in 2007 for $31.8 million. Debtor's majority owner is Transwest Partners, LLC, which, in turn, is owned by Michael Hanson ("Hanson") and Randal Dix ("Dix"). The Hotel is managed by Transwest Properties, Inc., which is also owned primarily by Hanson (45%) and Dix (35%). (Unless otherwise noted, Partners and Properties will be collectively referred to as "Transwest"). To finance the purchase of the Hotel, the predecessor of WBCMT 2007-C31 ("Lender") loaned Debtor $31,238,300.00 ("the Loan"). Repayment of the Loan was provided for by Note A in the original principal amount of $27,500,000 and Note B in the original principal amount of $3,738,300. (Note A and Note B will be collectively referred to as "the Notes"). The Notes were secured by a single deed of trust ("the DOT") on the Hotel and a single "Assignment of Leases and Rents" (collectively "the Loan Documents").

Through a series of assignments, Lender became the holder of Note A and Arbor Realty Funding, LLC ("Arbor") the holder of Note B. Pursuant to an intercreditor agreement ("the Intercreditor Agreement"), Lender was authorized to exercise all rights with respect to the Notes in bankruptcy proceedings. Debtor was not a party to the Intercreditor Agreement.

On the Petition Date, Debtor filed a Chapter 11 plan of reorganization and disclosure statement. That plan was amended three times before February 20, 2012, the date when debtor filed the Fourth Amended Plan. The Fourth Amended Plan was amended on March 29, 2012. On August 8, 2012, Debtor filed "non-adverse" modifications ("the Modifications") (the Fourth Amended Plan and the Modifications will be collectively referred to as "the Plan").[2]

---

[2] The Modifications were filed to conform with rulings made by the Court at or after the conclusion of the confirmation hearing.

On August 10, 2011, after an evidentiary hearing, an order was entered valuing the Hotel at $17 million. Subsequently, Lender filed a proof of claim and an amended proof of claim for Note A in the approximate amount of $33.7 million (Claim No. 15-2, "the Note A Claim"). Lender also filed a proof of claim for Arbor's Note B claim in the approximate amount of $5.5 million (Claim No. 16-1, "the Note B Claim"). On March 19, 2012, Debtor objected to the Note A Claim and filed a supplementary objection on May 24, 2012 ("the Claim Objection").

On October 20, 2011, Lender filed a Motion for Relief from the Automatic Stay ("MRS"), which thereafter "rode" the calendar with evidentiary hearings on confirmation.

B. Plan Summary

Before the Modifications, the Plan provided for HSL Properties, Inc. ("HSL") to make a $2.1 million cash infusion ("the New Equity") into the post-confirmation debtor ("the Reorganized Debtor") in exchange for a 70% ownership interest in it. Lloyd Construction ("Lloyd") would have received the remaining 30% equity interest in satisfaction of its $1.4 million claim. The Note A and B Claims were bifurcated into two classes. One class was treated as secured and scheduled to be paid $17 million over 23 years at 5% interest based on a 30-year amortization schedule, with the first three years consisting of interest-only payments. The other was treated as unsecured, a deficiency claim scheduled to be paid 5% of the Reorganized Debtor's net cash flow over 10 years, plus a pro-rata share of any preference recoveries. The Plan separately classified and impaired all other secured claims and proposed paying 100% of their value over extended terms, generally at 5% interest. Remaining general unsecured

creditors were going to receive the lesser of 25% of their claims or a pro-rata share of $46,468.44. Finally, the Plan provided for canceling Transwest Partners' equity.

The pre-Modifications Plan also provided for HSL to receive a 12% return on the New Equity ("the Preferred Return")[3] and reimbursement of all attorneys' fees incurred prior to confirmation.

C. Plan Confirmation

Lender filed ballots for the Note Claims rejecting the Plan. It also objected to Plan confirmation. All other voting creditors voted in favor of the Plan. Continued evidentiary hearings on Plan confirmation were held on April 3 and 4, 2012 and May 29 and 30, 2012. At the conclusion of the evidentiary hearings, the interest rate on Lender's secured claim was set at 6%. The Court requested post-trial briefs on all remaining confirmation issues. Before addressing other Plan issues, the parties elected to first address whether the Plan's classification of the Notes was proper.

On July 18, 2012, an order was entered finding that: (a) the Note A Claim and Note B Claim were two separate claims; (b) the Note A Claim and Note B Claim could not be placed in the same class; and (c) any undersecured portion of the Note A Claim and the unsecured Note B Claim could not be classified separately from other general unsecured claims. The Court gave Lender until July 31, 2012 to make an § 1111(b)(2) election for its Note A Claim and gave Debtor until August 8, 2012 to make the Modifications.

---

[3] The Preferred Return is to be paid from the Reorganized Debtor's surplus cash flow defined as calendar year net operating revenues, less operating expenses, debt service, taxes, management fees (Section 5.19 of the Plan), less funding for a working capital reserve of $500,000.00 and any other required reserves.

4

On July 20, 2012, Lender filed its notice of § 1111(b)(2) election to treat the Note A Claim as fully secured. As a result, there is no unsecured portion of the Note A Claim. On August 8, 2012, Debtor filed the Modifications, which: (a) adjusted the interest rate for the repayment of the secured portion of the § 1111(b)(2) claim to 6%; (b) classified the Note B Claim with other general unsecured claims in Class 16 and changed the treatment of the Class 16 creditors to include, along with a pro-rata distribution of approximately $45,000, the right to receive a pro-rata share of preference recoveries and 5% of the Reorganized Debtor's net cash flow over 10 years; and (c) changed HSL's proposed ownership of the Reorganized Debtor from 70% to 100% if the Court determined that Lloyd's claim was improperly classified. The Court then took Plan confirmation under submission.

### III. ISSUES

Does the Plan meet the confirmation requirements of 11 U.S.C. § 1129?

### IV. STATEMENT OF JURISDICTION

Jurisdiction is proper under 28 U.S.C. §§ 1334(b) and 157(b)(2)(L).

### V. DISCUSSION

The requirements for Chapter 11 plan confirmation are set out in 11 U.S.C. § 1129(a), and if, as here, a plan fails to satisfy § 1129(a)(8), then a plan also must satisfy § 1129(b). Debtor argues that it has met all of the requirements of § 1129(a) and (b). Lender disagrees. Rather than addressing each of the subsections of 1129(a) and (b), this memorandum will focus on §§ 1122, 1125, 1127 and 1129, all of which Lender asserts bar confirmation of the Plan.

5

A. <u>The Modifications' Reclassification of Note B Does Not Require Re-Solicitation of Votes on the Plan (§§ 1122 and 1125 Objections)</u>

Lender argues that because the Modifications include Note B in the general unsecured creditor class (Class 16), the Plan must be re-balloted because the Modifications are adverse to the general unsecured creditors. However, it is not clear that the general unsecured creditors have been adversely affected by the Modifications. While their pro-rata share of the $46,000 "pot" has been diluted by the inclusion of Note B, unsecured creditors now participate in a 5% distribution from the Reorganized Debtor's net cash flow for ten years and a pro-rata share of any net preference recoveries. As a result, it is at least possible that general unsecured creditors will realize a greater payout.

But even if the Modifications result in a smaller distribution to unsecured creditors who previously accepted the Plan, re-solicitation of their votes will not affect Plan confirmation. Once Note B was added to the general unsecured creditor class, its claim swamped the class, and the class has now rejected the Plan. That outcome will not change if the creditors, who previously accepted the Plan, are re-balloted. To require re-solicitation in these circumstances is the type of result bemoaned by Mr. Bumble in <u>Oliver Twist</u>, who complained because English law made him responsible for the actions of his wife that "the law is an ass." THE YALE BOOK OF QUOTATIONS 197-198 (Fred A. Shapiro, ed. 2006).

B. <u>The Plan Improperly Classifies Certain Claims (§§ 1122 and 1129)</u>

Section 1129(a)(1) requires that a Chapter 11 plan comply with all applicable provisions of the Code, including § 1122(a), a section which governs claims

6

classification. Classification of the Note B Claim with the Note A Claim has already been found to be improper. Lender further asserts that the Plan improperly classifies the claims held by Lloyd and another creditor, EZ Trading, because both creditors are receiving more for their unsecured claims than general unsecured creditors, thereby violating § 1129(b)(1)'s prohibition against unfair discrimination.

## 1. Lloyd

The Plan separately classifies Lloyd's claim because Lloyd threatened to bring an adversary proceeding asserting a right to a mechanic's lien or a claim for unjust enrichment for work done at the Hotel. Any mechanic's lien Lloyd might assert is based on work performed after Lender recorded the DOT. Given the Hotel's $17 million value, even if Lloyd has a right to a mechanic's lien, it would be junior in time and subordinate to Lender's claim, therefore completely unsecured. Any unjust enrichment claim is also a general unsecured claim because Lloyd did not obtain or record a judgment prior to the Petition Date.[4] Accordingly, Lloyd's claim must be treated the same as those of other general unsecured creditors. However, for the reasons previously explained, Debtor will not be required to re-ballot the Plan based on the reclassification of Lloyd's claim.[5]

## 2. EZ Trading

EZ Trading LLC ("EZ") holds a lien on some of Debtor's kitchen equipment. Debtor estimates the claim at $8,455.00. Debtor also estimates that the claim is undersecured. Nevertheless, the Plan treats EZ's claim as fully secured and

---

[4] The result might have been different if all unsecured creditors had been offered a chance to exchange their claims for the Reorganized Debtor's equity and only Lloyd had elected to do so.

[5] The Modification provides that if Lloyd's treatment is disallowed, HSL will receive 100% of the equity in the Reorganized Debtor.

7

impaired. Because the Plan provides for EZ's claim to be paid in full, its unsecured deficiency claim will be treated more favorably than the claims of general unsecured creditors.

Different treatment of claims with the same priority is permitted if it is supported by a rational basis. Steelecase, Inc. v. Johnston (In re Johnston), 21 F.3d 323, 328 (9th Cir. 1994). But the Debtor failed to provide any reason for the disparate treatment of EZ's claim. Accordingly, the treatment of EZ's claim is improper, and its deficiency claim must be treated the same as the claims of general unsecured creditors.

Assuming, without deciding, that EZ has now rejected the Plan because it is not receiving the treatment it voted for, the Plan may still be confirmed if there are other accepting impaired classes. Therefore, the legitimacy of the classification of the remaining accepting impaired classes must be reviewed.

### 3. Classes 8 through 15

Classes 8 through 15 consist of claims secured by Debtor's personal property, including vehicles. The Plan impairs all of these classes by paying them in full over an extended term either at the contract interest rate or 5%. Because each of the claims is secured by separate collateral, placing the claims in separate classes is permitted. In re Commercial W. Fin. Corp., 761 F.2d 1329, 1338 (9th Cir. 1985) ("Both Collier and case law establish that creditors with claims against different [collateral] are entitled to separate classification…").

Notwithstanding this general rule, Lender argues that Debtor has "artificially impaired" Classes 8 through 15 in order to obtain a consenting impaired class, actions which demonstrate a lack of good faith under § 1129(a)(3). In support of

8

this argument, Lender relies on evidence presented at the confirmation hearing which demonstrated that all of the classes could be paid in full at confirmation from Debtor's accumulated cash.[6]

However, Lender's artificial impairment argument is not supported by Ninth Circuit case law. The Ninth Circuit BAP has concluded that even though artificial impairment might sometimes indicate bad faith, Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson), 165 B.R. 470, 475 (9th Cir. BAP 1994), the gravamen of a bad-faith inquiry is whether a "plan achieves a result consistent with the objectives and purposes of the Bankruptcy Code." Beal Bank v. Windmill Durango Office, LLC (In re Windmill Durango Office, LLC), 473 B.R. 762, 778-79 (9th Cir. BAP 2012). When the totality of the circumstances indicates that a debtor has not acted in bad faith, artificial impairment is not fatal or controlling. Id. at 779 (finding that a debtor proposing to impair the claims of unsecured nonpriority creditors despite holding enough operating cash to pay the claims in full had not acted in bad faith). See also In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074-75 (9th Cir. 2002) (a plan which achieves a result consistent with the objectives and purposes of bankruptcy is considered filed in good faith, even when a plan allows a debtor to remain solvent while impeding contractual rights).

Lender additionally argues that the creation of the claims in Classes 8-15 demonstrates bad faith because the debts were incurred shortly before the Petition Date, after Debtor defaulted on the Loan. But Debtor presented credible evidence that the Class 8-15 debts were incurred for legitimate business reasons, such as acquiring a

---

[6] Debtor's evidence (Exhibit J) indicates it would have more than $750,000 in its operating account at confirmation.

van in order to provide a shuttle service for airline personnel and retain contracts with airlines. Accordingly, the Plan's classification and treatment of Classes 8-15 is proper.

C. Good Faith (§ 1129(a)(3))

Section 1129(a)(3) requires that a plan be proposed in good faith and not be forbidden by law in any way. The good-faith inquiry requires a totality-of-the-circumstances analysis. In re Seasons Partners, LLC, 439 B.R. 505, 513 (Bankr. D. Ariz. 2010) ("In order to determine good faith, a court must inquire into the totality of circumstances surrounding the plan, the application of the principles of fundamental fairness in dealing with creditors, and then decide whether the plan will fairly achieve a result consistent with the objectives and purposes of the Code"). Lender relies on two arguments to support its good-faith objection. Its first argument is that the Plan's claims classifications are improper. This argument has already been discussed and rejected.

Lender's second argument focuses on Debtor's prepetition "bad acts." According to Lender, it was improper for Debtor to increase Transwest's management fees after Debtor defaulted on the Loan. Increasing the management fees without Lender's consent violated the Loan Documents' covenants. Lender also asserts that because the payment of the past-due management fees occurred within one year of the Petition Date, it is an avoidable preference which Debtor has refused to pursue.

The latter argument is unpersuasive because the Plan provides for the appointment of an estate agent to pursue any avoidance actions. Nor are Debtor's other alleged prepetition bad acts fatal to confirmation. The totality-of-the-circumstances test is primarily forward-looking—does the Plan attempt to achieve "a result consistent with the objective and purposes of the Code?" Sylmar Plaza, 314 F.3d at 1074. The Plan

seeks to restructure Debtor's obligations by acquiring new capital through a new equity owner. That goal is consistent with the purpose of Chapter 11. Furthermore, prepetition violation of loan covenants is not the equivalent of committing waste on the Hotel or otherwise endangering the Lender's collateral. All parties in this case agree that the Hotel has been well-managed and maintained during the Chapter 11. Considering the entire record, Debtor has passed the totality-of-the-circumstances test, and accordingly, the Plan has been proposed in good faith.[7]

### D. Post-Confirmation Ownership and Management (§ 1129(a)(5)(A))

Lender asserts that the Plan does not pass muster under § 1129(a)(5)(A) because the transfer of the equity in the Hotel to HSL, and its continued management by Transwest, is inconsistent with the best interests of creditors. According to Lender, both HSL and Transwest have poor track records in owning and managing hotels, and both entities lack adequate hotel-management experience.

At the core of Lender's argument is the assertion that because a number of other Transwest-owned and -managed hotels have filed for bankruptcy, it is not competent to manage the Hotel. The evidence demonstrated that Transwest bought all of its hotels at or near the peak of the real estate bubble. The effects of the "Great Recession" have not been kind to hotel owners in Tucson.[8] But the purpose of Chapter 11 is to permit businesses, when they encounter the vagaries of a volatile market, to reorganize and restructure their debt. Furthermore, the evidence demonstrated that the Hotel has done

---

[7] To the extent that the good-faith requirement overlaps with the fair and equitable test, those issues are addressed *infra*.

[8] According to local news reports, a number of hotels in Tucson are either in receivership or face foreclosure.

well under Transwest's management, outperforming other hotels in its competitive set ("Competitive Set")[9] during the pendency of its Chapter 11 case.

Lender also complains that HSL's record in maintaining franchises for other hotels it owns is poor. However, HSL's principal testified that he has never defaulted on any secured hotel obligation (or any other secured obligation), including instances where the hotel that secures the debt is not generating sufficient cash flow to pay debt service. Debtor has, therefore, satisfied the requirements of § 1129(a)(5)(A).

E. <u>Legitimate Accepting Impaired Class (§ 1129(a)(10))</u>

Lender, relying upon its improper-classification and artificial-impairment arguments, asserts that Debtor has no legitimate accepting impaired class and, therefore, is unable to meet the requirements of § 1129(a)(10). However, for the reasons already explained, Classes 8-15 are legitimate accepting impaired classes. Accordingly, the Debtor has complied with the requirements of § 1129(a)(10).

F. <u>Feasibility (§ 1129(a)(11))</u>

Section 1129(a)(11) requires that a reorganization plan escape a determination that it is likely to be followed by a liquidation. In other words, a plan must be feasible to be confirmed. The parties strongly disagree on this point. Both sides submitted evidence, including expert testimony, on feasibility. According to Lender's experts, the Plan is not feasible because: (1) the New Equity is insufficient to make improvements required to keep the Hotel competitive, including implementing the franchisor's required Property Improvement Plan ("PIP"); (2) Debtor's projections do not demonstrate that the

---

[9] The Travel Industry Dictionary found at www.travel-industry-dictionary-com/comp-set defines "competitive set" as a selection of other competing hotels against which a property measures its own performance. The Lender challenged Debtor's choice of hotels for its competitive set, but Debtor's franchisor agreed with Debtor's definition.

balloon payment can be made at the end of the 23-year term; (3) the cash-flow projections do not account for the full amount of Lender's § 1111(b)(2) claim if the Claim Objection is not sustained; (4) Debtor's evidence in support of confirmation was based solely on a 5% interest rate and did not consider the Modifications' 6% interest rate; and (5) HSL, the new investor, has a poor track record when maintaining hotel franchises.

Debtor's evidence in support of feasibility was that: (1) the Hotel has consistently outperformed its Competitive Set and has performed well during the pendency of its bankruptcy case; (2) using the New Equity and cash on hand, Debtor will have enough capital following confirmation to undertake all needed capital improvements, including the PIP, and Lender's assertions that more improvements are necessary is inconsistent with the Franchisor-approved PIP; (3) Debtor's cash-flow projections are conservative and attainable; (4) HSL has never defaulted on any secured obligation; and (5) the balloon payment at the end of 23 years does not make the Plan infeasible.

Having considered all of the evidence with an understanding that in order to satisfy feasibility, a debtor must show a reasonable assurance, but not a guarantee, that a plan will be successful, the Court is inclined to find that Debtor has satisfied the requirements of § 1129(a)(11). However, Lender correctly points out that there is nothing in the record which demonstrates that the Reorganized Debtor will be able to satisfy the Lender's § 1111(b)(2) claim at 6% interest if the Claim Objection is not sustained. Were the Plan otherwise confirmable, the Court would reopen the evidence for the limited purpose of permitting the parties to address that issue. But as explained infra, the Plan cannot be confirmed, so there is no reason to take additional evidence

13

regarding feasibility. Similarly, there is no reason for the Court to rule on the Claim

Objection.

G. Lender's § 1129(b) Objections

Where, as here, all impaired classes do not accept a plan, confirmation can only

occur if the requirements of § 1129(b) are met.

Lender has raised three § 1129(b) objections. Lender's § 1129(b)(1) unfair-

discrimination objection was previously addressed in the classification discussion. The

remaining § 1129(b) objections are: (1) HSL's plan to enter into a post-confirmation

management agreement ("the Management Agreement") with Transwest and HSL's

exclusive right to acquire the New Equity in the Reorganized Debtor violate the absolute

priority rule of § 1129(b)(2)(B); and (2) the Plan does not satisfy the fair and equitable

requirement of §§ 1129(b)(2)(A) and (B).

1. Absolute Priority Rule

The absolute priority rule provides that "if a rejecting class of unsecured

claims is not paid in full, then the holder of any claim or interest that is junior to the

claims of such class will not receive or retain…any property...." In re Red Mountain

Mach. Co., 448 B.R. 1, 13-14 (Bankr. D. Ariz. 2011) (internal quotation omitted). But,

the Ninth Circuit permits old equity to acquire new equity if it contributes "new value."

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship. (In re Ambanc La Mesa Ltd.

P'ship), 115 F.3d 650, 654 (9th Cir. 1997).

Lender contends that the Management Agreement violates the absolute

priority rule because it permits Transwest to receive valuable property—a management

fee—in exchange for its pre-confirmation equity interest without contributing any "new

14

value." In support of that argument, Lender cites <u>In re Haskell Dawes, Inc.</u>, 199 B.R. 867 (Bankr. E.D. Pa. 1996). The <u>Haskell Dawes</u> court found that "retention and control over the management and profits" of a reorganized company is clearly of value and important to consider when assessing if a plan violates absolute priority. <u>Id</u>. at 880. In that case, a business debtor's equity holders proposed contributing $25,600 worth of new capital in exchange for continued control over debtor's profits, assured employment for at least one of the equity holders, health benefits, and the opportunity to generate additional revenue by leasing commercial real property from a different company also controlled by the equity holders. <u>Id</u>. at 869, 880-81.

The terms of the Management Agreement make clear that Transwest will not enjoy that sort of power or benefit. The Management Agreement provides Transwest Properties with the right to manage the Hotel for one year ("Initial Term").[10] After the expiration of the Initial Term, Transwest must satisfy stringent performance requirements to continue managing the Hotel, including assuring that the Hotel's net operating income is 95% or more of projected budgets, and that the Hotel achieves average revenue per room that is 15% higher than that of other hotels in the Competitive Set.[11] These facts distinguish the Plan from those in <u>Haskell Dawes</u>. Furthermore, Transwest Partners is receiving compensation for post-petition services, not for Transwest Properties' extinguished equity interest in the Debtor. Therefore, the Management Agreement does not violate § 1129(a)(2)(B)(ii).

Lender's second absolute-priority objection contends that HSL was offered the exclusive right to obtain the new equity in the Reorganized Debtor, a result

---

[10] <u>See</u> Lender's Exhibits 29, Article IV.

[11] <u>See</u> Lender's Exhibits 29, Articles III and IV.

15

forbidden by the Supreme Court in <u>Bank of Am. Nat'l Trust & Sav., Assoc. v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1998) ("<u>LaSalle</u>"). <u>LaSalle</u> involved a situation where the debtor proposed a plan during the exclusivity period which permitted only old equity to acquire new equity without making that opportunity available to creditors or to the public. <u>Id.</u> at 440-41. However, the Plan does not run afoul of <u>LaSalle</u> because exclusivity expired in February 2012,[12] and therefore, the holding of <u>LaSalle</u> is inapplicable. See <u>In re Red Mountain Mach. Co.</u>, 448 B.R. at 19.

     2. <u>Fair and Equitable</u>

       a. <u>Unsecured Creditors</u>

         The fact that the Plan does not violate the absolute priority rule arguably means that its treatment of unsecured creditors satisfies the fair and equitable requirement of § 1129(b)(2)(B). However, if Congress had wanted to limit § 1129(b)(2) solely to the treatment described in its subsections, Congress could have simply *required* a plan to provide for the treatment set out in those subsections. Instead, the prefatory language of § 1129(b)(2) provides that "the condition that a plan be fair and equitable with respect to a class *includes*" the treatment set out in its subsections (emphasis added). The use of the word "includes," a non-limiting word, as opposed to "requires" indicates that a plan must do more than satisfy the absolute priority rule in order to be "fair and equitable" to unsecured creditors. See also <u>In re Dollar Assocs.</u>, 172 B.R. 945, 949 (Bankr. N.D. Cal. 1994)

---

[12] Debtor acknowledged in its post-hearing brief that exclusivity had lapsed. In light of that acknowledgment, Lender has indicated that it will file a creditor's plan rather than pursue stay relief. As a result, no ruling will be made on the MRS.

Here, the Plan's projections indicate that HSL will receive $5 million as the Preferred Return over ten years, almost double the amount of the New Equity, as well as a 100% interest in the Reorganized Debtor. Meanwhile, the Plan projects that unsecured creditors will receive $89,000 in the first five years of the Plan along with the "possibility" of more during the next five years (including any recovery from avoidance actions), after which all payments to unsecured creditors ends. While parties who invest in Chapter 11 debtors are entitled to a reasonable rate of return on their investment, the return promisd to HSL compared to the rate of return for the unsecured creditors is so disproportionate that the Plan cannot satisfy § 1129(b)(2)(B).

### b. Lender's § 1111(b)(2) Claim

The remaining issue is whether the Plan satisfies § 1129(b)(2)(A) with respect to Lender's § 1111(b)(2) claim. The fair and equitable requirement for secured creditors begins with a simple mathematical calculation: Does the Plan's proposed stream of payments pay Lender the present value of its secured claim ($17million) and equal the full amount of the Note A claim? Debtor argues it can pass that test, both at a 5% or 6% interest rate. Yet, even if Debtor is correct and can satisfy the mathematical test, that by itself does not demonstrate that the Plan passes the fair and equitable test.

According to Lender, the way to assure that it is treated fairly and equitably is to require that its § 1111(b)(2) claim be paid according to market terms. Lender submitted expert testimony estimating what such terms would be. However, as those experts conceded, there *is no* extant market from which the terms for a 100%

loan to a property like the Hotel can be determined.[13] Therefore, evidence of the market

terms available for borrowers in situations far better than Debtor's, while informative and

the basis for the expert testimony, is not dispositive in deciding if the Plan is fair and

equitable. Such evidence is, however, helpful in analyzing how much risk the Plan

imposes on Lender. If the Plan shifts too much risk to the Lender, it cannot satisfy the

Code's fair and equitable requirement. In re DeTienne Asocs. L.P., 2005 Bankr. LEXIS

3122, 19-21 (Bankr. D. Mont. July 29, 2005); Aetna Realty Investors v. Monarch Beach

Venture (In re Monarch Beach Venture), 166 B.R. 428, 436 (C.D. Cal. 1993).

Additionally, as noted above, use of "includes" in § 1129(b)(2) allows for additional

considerations in analyzing whether a plan is fair and equitable. See, e.g., Red

Mountain Mach. Co., 448 B.R. at 13; see also In re Bjolmes Realty Trust, 134 B.R. 1000

(Bankr. D. Mass. 1991); In re Jones, 32 B.R. 951 (Bankr. D. Utah 1983)

        Ultimately, the final determination of whether a plan is fair and

equitable requires a context-specific analysis based on the facts of each case. Using

that analysis, the Plan fails the test.[14] In particular, the following provisions of the Plan

place undue risk on Lender:

        (i) the 23-year Plan term is twice as long as a typical 10-year

hotel franchise agreement. As a result, after 10 years, the Hotel may not have a

franchise "flag," a condition which both Debtor's and Lender's experts agree would

---

[13] This case, like many others in this district, is simply too small to be of any interest to potential sources of financing which are available in larger Chapter 11 cases filed in districts like the Southern District of New York. Accordingly, there is no "bankruptcy" loan which can be used as a comparison for the Plan's loan.

[14] Many of the Plan's terms regarding the treatment of Lender's § 1111(b)(2) claim were approved in another case where Transwest Partners owned the Debtor. However, in that case, all but one of the modifications was agreed to by the lender. Here, the Lender has not consented to any part of the treatment of its 1111(b)(2) claim.

18

negatively impact the value of the Hotel. Debtor argues that it would make no sense for the Hotel's owner not to renew the Hotel's franchise and, therefore, the risk to Lender is minimal. Furthermore, Section 4.1 of the DOT, which the Plan indicates will be retained post-confirmation, makes termination of a franchise agreement an event of default. But if a franchise agreement is terminated, the Hotel will suffer a loss in value before the Lender can exercise its foreclosure rights;

(ii) the "due on sale provisions" of the DOT are suspended between Year Five and Year Fifteen of the Plan. The only protection provided to Lender is the right to consent to the new owner, which consent shall not be "unreasonably" withheld—a standard so broad that it is a recipe for future litigation about what terms of the DOT will have to be met by the transferee;

(iii) the abolition of the Plan's interest reserve account after three years, when fully amortized payments of interest and principal first become due to the Lender;[15]

(iv) the absence of a requirement that post-confirmation accounts (interest reserve, capital, etc.) be deposited with Lender; and

(v) the failure to require any guarantees, including limited "bad boy" guarantees of the PIP.[16]

---

[15] There are debt-service-ratio and cash-on-hand restrictions which must be met before the interest reserve account can be abolished, but the Plan's cash-flow projection indicated that those restrictions can be easily met in Year Three of the Plan.

[16] Upon cross examination by HSL's counsel, Lender's representative acknowledged that even if guarantees were given or various accounts were deposited with Lender, Lender would still reject the Plan. But a plan may be fair and equitable even when a creditor rejects it. The fact that Lender would reject any version of the Plan is largely irrelevant to the fair and equitable determination.

19

Case 4:11-bk-15267-EWH   Doc 370   Filed 11/07/12   Entered 11/07/12 14:32:01   Desc
Main Document - Memorandum/Opinion   Page 19 of 21

While any one of the above-listed modifications of Lender's rights might be acceptable—especially were more protections for Lender added—taken as a whole, these terms shift too much of the burden of reorganization to Lender for the Plan to pass the fair and equitable test.

In addition to shifting too much of the risk, the Plan unfairly favors the new equity holder. As noted earlier, the Plan permits HSL to realize substantial benefits of the reorganization fairly quickly by returning to HSL twice the New Capital in 10 years. HSL also assumes immediate ownership and a right to any net profits. According to the Plan's projections, those profits could be several million dollars at the end of Year Ten. During those same 10 years, Lender receives a payment stream which does not fully amortize its debt and leaves it with the risk of a balloon payment 13 years later.

## VI. **CONCLUSION**

Chapter 11 provides a business debtor with the opportunity to restructure its debt and hopefully maintain employment opportunities for its workers.[17] The Code provides powerful tools to assist a debtor's reorganization efforts, including the right to extend loan terms, change interest rates, and rewrite or eliminate loan covenants. But to successfully exercise those rights, a debtor must assure that the risk of reorganization is borne fairly by all of the parties in the case. Debtor has failed to do so, and therefore,

---

[17] Restructuring businesses so they can remain taxpaying members of a community and a source for employment is an important policy goal of Chapter 11. However, when a business is a service business, such as a hotel, there is little risk of jobs leaving the community. The real risk to employment in this case is to upper-level management and for the employees of Transwest as the manager of the Hotel who will not be retained if the Plan is not confirmed.

the Plan cannot be confirmed. A separate order denying confirmation of the Plan will be

entered on this date.[18]

        Dated and signed above.

Notice to be sent through the
Bankruptcy Noticing Center
to the following:

Reid Park Properties LLC
2850 E. Skyline Dr., Ste. 200
Tucson, AZ 85718

Eric Slocum Sparks
Eric Slocum Sparks PC
110 S. Church Ave. #2270
Tucson, AZ 85701

Rob Charles
Lewis and Roca LLP
One S. Church Ave., Ste. 700
Tucson, AZ 85701

David M. Neff
Eric E. Walker
Perkins Coie LLP
131 S. Dearborn St., Ste. 1700
Chicago, IL 60603

Office of the U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003

---

[18] The foregoing constitutes the court's findings of fact pursuant to Rule 7054.